29960. JOHNSON *v.* THE STATE.

DECIDED JULY 14, 1943.

*Miller & Miller, A. B. Conger,* for plaintiff in error.

*Maston O'Neal, solicitor-general,* contra.

MACINTYRE, J. The defendant, Cal Johnson, was indicted and convicted for the offense of stealing five mules from the Layson Lumber Co., valued at $1650. The mules were found two days later fifty miles from the place of the taking in possession of the defendant. It should be borne in mind that after a verdict of guilty, in passing on a motion for new trial, that view of the evidence most favorable to the State must be taken, for every presumption and every inference is in favor of the verdict. *Vandeviere* v. *State,* 58 *Ga. App.* 18 (197 S. E. 338). The brief of evidence discloses that the mules were taken from the mule pen of the Layson Lumber Co., which was in view of its saw mill, just a few minutes before or a few minutes after midnight on Tuesday, April 8, 1941 The foreman of the saw mill in question testified that the mules "were put in the pen Tuesday night when we quit work. I discovered they were missing the next morning at 8 o'clock when we started to work. We had collars and bridles for those mules but they were not kept on them during the night. They were by the gate; they were gone too." Two days later they were found in the

possession of the defendant on his farm fifty miles from the saw mill. Two witnesses, who worked for the saw mill, testified that the defendant was at the saw mill on Friday before the mules were removed on Tuesday night. One of them testified: "I saw him and talked with him. When he came down there he asked me where my boss was. I was firing the boiler. He asked me where my boss man was and I told him he was in the woods. He said he wanted to buy some lumber. He asked if the mill wasn't hard to fire, and I said 'No, sir.' He said 'You have got some fine mules there,' and I said, 'Yes, sir.'" Thus the defendant knew that the saw mill was in active operation. The defendant stated in essence that on Tuesday afternoon of April 8th, he was in Donalsonville and saw some mules on a truck, and as he was in the market for some mules, he got upon the truck to see them. A gypsy came up to him and tried to sell the defendant the mules but they could not "get together" on the price. Whereupon, the gypsy told the defendant that he had some other mules "that he had traded for up at a lumber camp," which he would sell him at a better price. The defendant borrowed his brother's car and, accompanied by the gypsy [on the afternoon of April 8th], drove "down by Arlington and turned off by the creek. We went in there a pretty good piece off the public road, about four miles I guess. We looked at some mules there and he was rather steep on his prices. He come down some from the price of the ones he had on his truck, though, but I didn't trade with him on those. We came on out of there and went to see the others, he told me that they were in the other pen. We went in a cattle gap and we came out in an oat patch. When we got there I knew where we were. That was the first time that I knew where we were or what locality we were in. When we got there I said, 'Who did you say you got these mules from?' and he said 'Layson Lumber Company.'" The defendant and the gypsy could not agree on any price for the mules at the pen but returned to Donalsonville where they finally agreed on a price of $500. Said amount was paid by a post-dated check [check was dated May 1, 1941], which the defendant obtained in a drug store in Donalsonville. The defendant then, on that night, April 8, 1941, went by the blacksmith shop, got his truck, drove back to the pen, loaded the mules around midnight, and carried them to his farm approximately fifty miles away. The defendant introduced many wit-

nesses who testified that he had had a good character for many years. He also introduced a witness who testified that on the afternoon of April 8th, the defendant and a stranger went to a filling station in his brother's car and bought some gasoline. Several other witnesses testified that the defendant told them on the afternoon of April 8th, that he was going to Calhoun County to look after some mules. And two witnesses testified that, on a road leading from Donalsonville north toward Calhoun County, the defendant, while traveling in his brother's car met them on the road, stopped and had a conversation with them, and that there was a stranger in the car with him. So far as the record discloses, the defendant, on his subsequent trip with a large truck in the night to and from the mule pen from which he removed the mules, neither saw nor talked to anyone he knew. The defendant's father and a man who worked for the defendant testified that on the afternoon of the 9th of April, two of the mules were driven to town to a wagon and three of the mules were plowing in a field, which could be seen by any person passing along the public road. The defendant also said the same thing in his statement. However, the sheriff of Calhoun County, where the mules were taken, and the sheriff of Seminole County, the county where the defendant lived, and where the mules were found, testified that they drove by the field, referred to by the defendant and his witnesses, on the afternoon of April 9th, and that they looked, but they did not see any mules in the fields or the lots of the defendant or of his father, who lived about one-quarter or one-half of a mile on the opposite side of the road from the defendant. On the next day the officers found the mules plowing in the field of the defendant's father near the road and fully exposed to view. The effect of the testimony of two policemen of the City of Donalsonville was that at the time defendant stated that he and the gypsy went to Calhoun County in his brother's car, this car was parked on the street in Donalsonville, and that the defendant could not have used this car at the time he stated. The defendant in his statement said that on April 8th, he gave the gypsy, Sherlock, a post-dated check in the amount of $500 for these five mules, which the State contended were worth $1650. A clerk in the drug store in Donalsonville testified that the defendant came into the drug store on April 8, 1941, at about 8:30 p. m., and asked him for a blank check. "I gave him one and he asked

me for a pen, and I told him that he could get one there in the back. There was a stranger with him. After he wrote out the check he gave it to the stranger." The proprietor of the drug store testified that on April 8, 1941, he saw the defendant in his drug store with a stranger. This check was post-dated for about three weeks. The jury might have thought that, in connection with other circumstances, it was out of the ordinary for a stranger, who was criminally disposing of the property of another, not to require cash, or if he accepted a check at all, to require that it be dated the day of the sale, so that he could obtain the money as quickly as possible and make his get away with his criminally gotton gains. The cashier of the bank in Donalsonville upon which the check was given, said that a check with a notation thereon "For five mules" payable to Sherlock, dated May 1, 1941, after having been endorsed by Sherlock in Fort Worth, Texas, and after having been duly transmitted through banking channels, was presented to his bank on May 9, 1941, and that it was either a week or two weeks prior to May 9, 1941, that the defendant had notified the bank not to cash the check. Thus it would be about two weeks after the stolen mules were found in the defendant's possession before he notified the bank not to cash a check, which he says he gave the gypsy at the time he purchased the mules. In stating the transaction to the sheriff as to how he came into possession of the mules, the record does not show that he told the sheriff that he had given a post-dated check to a gypsy, and thus give the officers information that might possibly have helped them to locate the said gypsy. Nor does he, in his statement to the jury, say when, if at any time, he notified the bank not to cash the check. The only testimony on this subject being the cashier's statement above recited. The jury might have thought that this check matter was an after-thought by the defendant, and that there was ample time after the defendant had been accused of taking the mules for the check to have been carried to a point in Texas and there deposited; and that the defendant, although his post-dated check was still outstanding, did not notify the bank to stop payment on the check until two weeks after he had been charged with the theft of the mules. Neither does the record show that he at any time notified the officers or any other person of such outstanding, unpaid, post-dated check.

The motion for new trial was based solely on the general grounds.

The evidence authorized the verdict, and the judge did not err in overruling the motion for new trial.

*Judgment affirmed.* *Broyles, C. J., and Gardner, J., concur.*